# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALPHA JALLOH,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>DUSTYN HUGEE, *et al.*,<br><br>　　　　　　　　Defendants. | Case No. 21-cv-1480 (JMC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Alpha Jalloh was sitting in the driver's seat of his car when officer Dustyn Hugee approached, opened the door, and asked him to get out. After Hugee asked Jalloh to exit a few more times, Hugee took out his gun and pointed it at Jalloh. Another officer, Michael Vaillancourt, then reached into the car, pulled Jalloh out, pushed him to the ground, and put him in handcuffs. While the officers held Jalloh in custody, they searched his car for weapons. When they did not find anything, they let Jalloh go. Jalloh sued Hugee and Vaillancourt, alleging they violated his Fourth Amendment rights and falsely arrested him in violation of D.C. law. Because there is a genuine dispute of fact about why Hugee detained and arrested Jalloh, the Court will **DENY** the Defendants' motion for summary judgment as to Hugee. The Court **GRANTS** the motion as to officer Vaillancourt, however, because the undisputed facts entitle him to qualified immunity on the federal claims and judgment as a matter of law on the false arrest claim.[1]

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.     BACKGROUND

### A.  Factual background

Metropolitan Police Department Officers Hugee and Vaillancourt were dispatched to a corner in Southwest D.C. after a citizen complained that people were gambling, drinking, and smoking marijuana in the area. *See* ECF 34-2 ¶ 1; ECF 35-3 ¶ 1; *see also* ECF 34-4 at 4:21–5:5; ECF 34-4 at 13:9–14. Both officers had on body worn cameras. When Hugee arrived, he exited his car and approached a blue Nissan Altima. *See* ECF 34-4 at 30, Hugee Body Worn Camera, at 2:06 [hereinafter Hugee BWC]. Other officers were already on the scene. *See id.* Jalloh was sitting in the driver's seat of the car with the door closed. *See id.* Hugee walked towards the car and then opened the driver's side door while simultaneously asking Jalloh to "come out of the car." *Id.* at 2:13–14.

Why Hugee approached the vehicle and ordered Jalloh out is hotly disputed. Jalloh was not gambling, drinking, or smoking when Hugee walked up to the car. *Id.* at 2:06. But Hugee says that, earlier that same day, he had received a "be on the lookout" notice (what both parties call a BOLO) for a blue Nissan Altima that, according to Hugee, was involved in a "rash of shootings . . . in Southwest DC." ECF 35-6, at 8:11–15. Hugee had also, he says, received a different BOLO for an individual that was involved in a shooting. *See id.* at 13:12–16. That BOLO included a picture of the suspect. *Id.* at 14:8–14. Hugee says that as he was "exiting" his vehicle he "recognized . . . the blue vehicle" from the first BOLO, *id.* at 7:20–8:5, and that after he "exited" and started to approach Jalloh he "put together" that Jalloh "matched the picture of that suspect" in the second BOLO, *id.* at 13:17–14:7.

Jalloh, however, tells a different story. He says there was no BOLO for a blue Nissan Altima. *See, e.g.*, ECF 35-1 at 15 ("Defendants have provided no evidence to suggest that the

BOLO for the blue Nissan Altima ever truly existed."). He points out that although Hugee testified in his deposition that he received that BOLO via email, Hugee now says he has no "documentation . . . that supports that there was" such a BOLO. ECF 35-6 at 9:8–10, 11:7–10. And Vaillancourt testified that he was not aware of any BOLO for a blue Nissan at the time of Jalloh's arrest. ECF 35-7 at 5:9–15. As for the BOLO with a suspect that Hugee says looked like Jalloh, Jalloh notes that Hugee did not look at that BOLO "prior to exiting [his] vehicle," but instead returned to look at it *after* Jalloh was in handcuffs, at which point he realized Jalloh was not the suspect. ECF 35-6 at 14:8–19. Jalloh draws the conclusion that, in the absence of any BOLO about the Nissan, and without any objectively reasonable belief that the suspect in the photo looked like Jalloh, Hugee stopped him without reasonable suspicion. *See* ECF 35-1 at 6–7.

Setting aside for now why Hugee approached Jalloh, it is undisputed that the encounter quickly escalated after he did. After Hugee opened Jalloh's door and asked him to get out, he told Jalloh to "get out of the car" three more times. ECF 34-4, Hugee BWC, at 2:14–20. Hugee then drew his gun, pointed it at Jalloh, ordered him not to "do anything stupid," and once more told him to "get out of the car right now." *Id.* at 2:17–23. Hugee says he did that because he saw Jalloh make "movements as [] if he was going to retrieve something from the vehicle." ECF 34-4 at 15:6–8. Jalloh says he did nothing of the sort. *See* ECF 35-5 at 5 ("I began to move very slowly and deliberately to exit the vehicle.").

Officer Vaillancourt—who arrived on the scene separately from Hugee and approached the vehicle just as Hugee went to open the car's door—was at that point standing behind Hugee towards the back of the car. *See* ECF 34-4 at 29, Vaillancourt Body Worn Camera, at 2:04–14 [hereinafter Vaillancourt BWC]. Within seconds of Hugee drawing his gun, Vaillancourt reached into the vehicle, grabbed Jalloh by his left arm, and pulled him out of the car. *See id.* at 2:14–17.

Vaillancourt then pushed Jalloh to the ground and put him in handcuffs. *See id.* at 2:17–43. After putting on the handcuffs, Vaillancourt stayed on top of Jalloh for around 13 seconds longer with his knee in Jalloh's back while he asked Jalloh why he did not get out of the car when ordered to do so by Hugee. *See id.* at 2:43–56.

Vaillancourt then got off Jalloh and sat him up. *See id.* at 3:00. Meanwhile, Hugee searched inside the car in the area around the driver's seat. *See id.* at 3:00–24. After some conversation, Vaillancourt stood Jalloh up—still in handcuffs—and Hugee searched Jalloh's pockets. *See id.* at 5:17–6:00. While Hugee was searching him, Jalloh said "I don't consent to searches." *Id.* at 5:20–24. Hugee responded that Jalloh did not "have that right," with either Hugee or Vaillancourt adding (it is not clear who from the body camera footage), "you're done, you're in handcuffs." *Id.* at 5:24–34; *see also* ECF 34-2 ¶ 12; ECF 35-3 ¶ 12.

Vaillancourt held Jalloh in handcuffs while the officers on the scene waited for a police dog to arrive. *See* ECF 34-4, Vaillancourt BWC, at 14:18–24 (officer tells Jalloh he will be detained until the dog comes). Once the dog arrived, it sniffed the exterior of the vehicle and alerted for firearms. ECF 34-2 ¶ 14; ECF 35-3 ¶ 14. Hugee and other officers then searched the vehicle. *See* ECF 34-2 ¶ 13; ECF 35-3 ¶ 13; *see also* ECF 34-4, Vaillancourt BWC, at 20:00–21:00.

But the officers did not find weapons, or anything else illegal, in the car. ECF 34-2 ¶ 14; ECF 35-3 ¶ 14. So after the search finished, Vaillancourt removed Jalloh's handcuffs and, soon thereafter, told a medical professional who had arrived to treat Jalloh that Jalloh was "not under arrest." ECF 34-4, Vaillancourt BWC, at 40:50–55; *see* ECF 34-2 ¶ 15; ECF 35-3 ¶ 15 (parties agree that "Vaillancourt released Plaintiff from the handcuffs once officers finished searching" the car). All told, Jalloh was in handcuffs for around 37 minutes. *See* ECF 34-4, Vaillancourt BWC, at 2:40–38:30. The encounter left Jalloh injured, and he needed surgery to repair a tear in his

shoulder. *See* ECF 35-5 at 5, 8. He still has pain in that shoulder, which is "aggravated when [he] work[s]" because his job transporting passengers to the airport requires lifting baggage. *Id.* at 8.

### B. Procedural background

Jalloh filed this lawsuit against Hugee, Vaillancourt, and a handful of other officers who were on the scene at the time of the incident. *See* ECF 1. Jalloh brought claims under 42 U.S.C. § 1983, alleging that the officers violated the Fourth Amendment by unlawfully seizing and searching him and by using excessive force during his arrest. *See id.* ¶¶ 38–58. He also brought section 1983 claims against the officers on the theory of "bystander liability," alleging that even those who were not "directly involved in the use of excessive force or deprivation of other constitutional rights" could be held liable as bystanders. *Id.* ¶¶ 59–64. Finally, he brought claims against all of the officers for false arrest under D.C. law. *Id.* ¶¶ 65–74.

After discovery closed, Jalloh dismissed the claims against everyone other than Hugee and Vaillancourt. *See* Minute Order August 23, 2022. He also dismissed his official capacity claims against officers Hugee and Vaillancourt. *See id.* And after the Court directed him to clarify whether he intended to pursue any bystander liability claims, he confirmed that he was abandoning those claims, as well. *See* ECF 34-4 at 32.

The only claims left in the case, then, are Jalloh's individual capacity claims against Hugee and Vaillancourt, alleging that each officer violated his Fourth Amendment rights and violated D.C. law by making a false arrest. In their joint motion for summary judgment, the officers break those constitutional claims down into "five distinct events"—(1) Hugee ordering Jalloh to exit the vehicle, (2) Vaillancourt taking Jalloh down to the ground, (3) Hugee searching Jalloh's pockets, (4) Hugee searching Jalloh's car, and (5) Vaillancourt holding Jalloh in handcuffs while the officers searched his car—each of which gives rise to its own legal claim involving either a search,

seizure, or use of force. ECF 34-1 at 5. Jalloh has adopted this same framing in his response. *See generally* ECF 35-1 (point headings in brief correspond to same five events). Following the parties' lead, the Court treats these as Jalloh's constitutional claims, some of which run against Hugee, others of which run against Vaillancourt.

## II.     LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "may neither make credibility determinations nor weigh the evidence." *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018). "Instead, summary judgment is proper only when, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences accordingly, no reasonable jury could find in the plaintiff's favor." *Id.*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether an official is entitled to qualified immunity at the summary judgment stage, the Court must "decide whether the facts that a plaintiff has . . . shown"—applying the summary judgment standard and viewing the record in the light most favorable to the plaintiff—"make out a violation of a constitutional right." *Id.* at 232. The Court must also "decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* These two inquiries are referred to as the "two prongs of the qualified immunity analysis," and the Court has "discretion in deciding" which "should be addressed first." *Id.* at 236.

III.    **ANALYSIS**

As the parties' briefing makes clear, Jalloh has brought distinct claims against Hugee and Vaillancourt that correspond to each of their individual conduct during the incident. The Court therefore addresses each officer in turn, before closing with Jalloh's false arrest claims.

**A. Officer Hugee is not entitled to summary judgment.**

Jalloh challenges three actions taken by Hugee: (1) his initial stop and seizure of Jalloh when he approached and opened Jalloh's car door, (2) his search of Jalloh's pockets after Jalloh was in handcuffs, and (3) his search of Jalloh's car. *See* ECF 35-1 at 5, 11–13. Hugee is not entitled to summary judgment on any of these claims.

**1. A jury could find that Hugee stopped Jalloh without reasonable suspicion, which violates a clearly established right.**

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The parties agree that when Hugee opened Jalloh's car door and "order[ed] him to get out of" the car, Jalloh was seized. ECF 34-1 at 8; *see also* ECF 35-1 at 5–7. They further agree that this seizure would have been reasonable, and therefore lawful, if—at the moment of the seizure—a reasonable officer in Hugee's position would have had "reasonable suspicion" that Jalloh had committed a crime. ECF 34-1 at 7; ECF 35-1 at 5–6 (both parties citing *Terry v. Ohio*, 392 U.S. 1 (1968), and contesting whether Hugee had the requisite "reasonable suspicion").

Hugee points to two facts that he says gave rise to reasonable suspicion. First, that he received the BOLO earlier that morning notifying him that a blue Nissan Altima was involved in shootings in Southwest D.C., and second, that he had with him in his patrol car a second BOLO with a photograph of a suspect who was involved in a shooting. *See* ECF 34-1 at 7–8 (relying on these two "specific facts"). Hugee says that, as he exited his vehicle, the blue Nissan Altima Jalloh was sitting in reminded him of the first BOLO, and that he also thought Jalloh looked like the

suspect in the second. *See* ECF 35-6 at 8:2–5, 13:17–19. Jalloh, however, offers a different account of the facts. He insists there was no BOLO for a blue Nissan, *see* ECF 35-1 at 15, and casts doubt on whether Hugee was aware of the photograph of the suspect in the second BOLO before he seized Jalloh and, even assuming he was, whether an officer in Hugee's position could reasonably have thought Jalloh resembled that suspect, *see id.* at 6–7.

There is a genuine dispute about each of these facts and the jury could resolve them in Jalloh's favor. Start with the BOLO for the blue Nissan. The *only* evidence in the record that the BOLO for the car ever existed is Hugee's deposition testimony saying so. *See* ECF 34-2 ¶ 2 (Defendants' statement of undisputed facts citing only Hugee deposition). As Hugee conceded, he has no "documentation at this point that supports that there was a BOLO for the blue Nissan [A]ltima," even though he testified that he received the BOLO in an email. ECF 35-6 at 9:8–10, 11:7–10. Vaillancourt could not substantiate Hugee's testimony that the BOLO existed, either. *See* ECF 35-7 at 5:9–11. The existence of the BOLO therefore boils down to the sort of "he said, she said" that must be resolved in Jalloh's favor at this stage. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 564 (D.C. Cir. 2019). While Hugee offered an explanation for his inability to produce the BOLO—testifying that he is emailed "thousand[s] of [BOLOs] on a daily basis," ECF 35-6 at 9:8–10—the fact that he could not find the email despite its critical significance to this case and that another officer had no recollection of the BOLO could give a jury real pause about his testimony. Ultimately, it is the jury's role to "make credibility determinations," *Iyoha*, 927 F.3d at 565, and here it could discredit Hugee's testimony and find that no BOLO for a blue Nissan existed.

So too could the jury discredit Hugee's testimony about the BOLO for the suspect that Hugee says looked like Jalloh. That BOLO indisputably existed. *See* ECF 34-4, Hugee BWC, at 4:34 (Hugee returns to his vehicle after initial contact with Jalloh and looks at the printed copy).

But whether Hugee had any basis to believe Jalloh was that suspect is a different story. For one, the jury could find that Hugee had not looked at or had little more than a vague recollection of that BOLO when he opened Jalloh's door and seized him. Hugee's body camera shows that the printed copy of that BOLO was on the floor in the passenger seat of his car folded in half so that the photograph was not visible. *See id.* at 4:27–28. And Hugee testified that he did not look at the image before exiting his car, but instead only "went back to refer" to the picture "once [Jalloh] was stopped." ECF 35-6 at 14:8–15.

For another, a jury could find that Jalloh bore little or no resemblance to the suspect pictured in the BOLO. Regardless of whether Hugee sincerely held the mistaken belief that Jalloh was that suspect, the stop was only justified if Hugee's mistake was objectively reasonable. *See United States v. Williams*, 878 F. Supp. 2d 190, 200 (D.D.C. 2012) (collecting cases explaining that "stops premised on mistakes of fact generally have been held constitutional so long as the mistake is objectively reasonable"). A reasonable jury could find that, even insofar as Hugee was aware of the photograph and had it in mind when he exited his vehicle, it was not reasonable for him to believe that Jalloh was the suspect in the photograph.[2]

If the jury resolves these factual disputes in Jalloh's favor, he will have easily proved that Hugee violated his Fourth Amendment rights when he seized him by opening the car door and

---

[2] The circuits seem to be split over whether the objective reasonableness of an officer's mistake of fact is a question of fact for a jury or a question of law for a court. *Compare, e.g.*, *Est. of Harmon v. Salt Lake City*, 134 F.4th 1119, 1127 (10th Cir. 2025) (describing the "reasonableness of a mistake" of fact as "a question of fact rather than a matter for the court to decide as a matter of law"), *and D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 772 (9th Cir. 2025) (same), *and Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020) (same), *with Simmons v. Bradshaw*, 879 F.3d 1157, 1164 (11th Cir. 2018) ("[T]he question of whether the officer's perceptions . . . were objectively reasonable . . . is a question of law for the court."), *and Green v. City of St. Louis*, 134 F.4th 516, 526 (8th Cir. 2025) (same). The D.C. Circuit does not appear to have weighed in yet. This Court is tentatively of the view that it is a question of fact for a jury but need not decide at this stage. Even if the reasonableness of Hugee's mistake is a question of law, on the record before the Court the mistake seems an unreasonable one. The BOLO of the suspect is not in the record, so the Court can only compare the brief glimpse of it seen in Hugee's body camera footage with the footage of Jalloh. While the Court reserves ultimate judgment, it is skeptical that Jalloh and the BOLO bore much resemblance at all. *Compare* 34-4, Hugee BWC, at 4:34 (BOLO), *with id.* at 2:12 (the view of Jalloh that Hugee had when he initiated the stop).

ordering him out. Without the BOLO for the blue Nissan and with the jury concluding that a reasonable officer would not have thought that Jalloh was the suspect in the second BOLO—either because the officer had not seen or did not have at top of mind that BOLO, or because Jalloh did not actually resemble the suspect, or both—Hugee stopped Jalloh without any suspicion at all. *See* ECF 34-2 ¶¶ 1–7 (Defendants' statement of undisputed facts relies only on the two BOLOs to support the initial stop). "An investigatory stop *must* be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added). Because the jury could find that Hugee's stop of Jalloh lacked any objective justification at all, Hugee has at this stage sufficiently "ma[d]e out a violation of a constitutional right." *Pearson*, 555 U.S. at 232.

So too was "the right at issue . . . clearly established at the time of [Hugee's] alleged misconduct." *Id.* The Supreme Court has long held that officers can "initiate . . . brief investigative traffic stops" where they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity," but not where they have a "mere hunch" or, as a jury could find here, no objective basis at all. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). Decisions of the D.C. Circuit—and every other court of appeals—have firmly established that rule, as well. *See, e.g.*, *United States v. Montgomery*, 561 F.2d 875, 879 (D.C. Cir. 1977) (stop of vehicle was unlawful because officers had nothing more than an "inarticulate hunch"); *Johnson v. Phillips*, 664 F.3d 232, 237 (8th Cir. 2011) ("It was well-known at the time of the incident that an investigatory stop is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot."); *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1052 (9th Cir. 2014) ("It was established at the time of the incident that individuals may not be subjected to seizure . . . without reasonable suspicion."). And the Supreme Court and D.C. Circuit have both

applied that rule in cases where officers stop individuals sitting in parked cars—as Jalloh was here. *See Adams v. Williams*, 407 U.S. 143, 144–46 (1972) (asking whether *Terry* stop of person sitting in parked car was objectively reasonable); *United States v. Edwards*, 424 F.3d 1106, 1108 (D.C. Cir. 2005) (same); *see also United States v. Delaney*, 955 F.3d 1077, 1079–80, 1087 (D.C. Cir. 2020) (stop of person sitting in parked vehicle violated Fourth Amendment because it was done without "a reasonable and articulable suspicion"). Other circuits have done the same. *See, e.g.*, *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014) (no reasonable suspicion to order suspect out of parked car). All of that settled law was more than enough to give Hugee "fair warning that his alleged misconduct was unconstitutional." *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) ("In determining whether officers strayed beyond clearly established bounds of lawfulness, we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view.").

And while the jury could find that Hugee could not have relied on the BOLO of the suspect because he did not know or remember what that suspect looked like, even if it concludes that he was actually aware of that BOLO Jalloh can still prove that Hugee violated a clearly established right. Officers cannot conduct stops relying only on a claimed match to a photograph where the suspect in the photo and the individual being detained "do not look alike." *United States v. Watson*, 787 F.3d 101, 105 (2d Cir. 2015). That's because "material differences" between photographs and suspects that are "apparent to any reasonable officer" dispel reasonable suspicion. *Id.*; *see also, e.g.*, *United States v. De La Cruz*, 703 F.3d 1193, 1196–97 (10th Cir. 2013) ("discrepancies" between photo and detained person, when "viewed by an objective officer," would "dispel[] any reasonable suspicion"). And it is equally established that generic similarities between a person and a photograph do not give rise to reasonable suspicion where those similarities are shared by "too

many people to constitute sufficient articulable facts on which to justify a forcible stop." *United States v. Walker*, 965 F.3d 180, 186–87 (2d Cir. 2020) (that individual in photograph and person stopped were both Black men with "medium-to-dark skin tone," "glasses, long hair, [and] facial hair" is insufficient "to constitute . . . reasonable suspicion"). Should the jury conclude Hugee stopped Jalloh based only on a photo to which he bore little if any resemblance, Jalloh will have established that Hugee violated his clearly established rights.

### 2.    A jury could find that Hugee searched Jalloh's pockets after unlawfully arresting him, which violates a clearly established right.

The Court's conclusion as to the claim about the lawfulness of the initial seizure largely dictates the result for the claim that Hugee illegally searched Jalloh's pockets. Hugee justifies that search as a "lawful search incident to an arrest." ECF 34-1 at 10. As he sees it, Jalloh was under arrest after Hugee pointed his gun at him, Vaillancourt "apprehended him," and Jalloh was placed in handcuffs. *Id.* And because Jalloh was under arrest, Hugee concludes, his search of Jalloh "was lawful under the well-established search incident to arrest" doctrine. *United States v. Bookhardt*, 277 F.3d 558, 564 (D.C. Cir. 2002); *see* ECF 34-1 at 12.

"The validity of a search grounded upon that exception depends on the lawfulness of the arrest, which in turn requires probable cause to believe that a crime has been committed." *Bookhardt*, 277 F.3d at 564. This is where Hugee's argument runs into trouble. Hugee says he had probable cause to arrest Jalloh because (1) Hugee had the BOLOs, (2) Jalloh "reached toward the floor of his car[,] leading Hugee to believe [Jalloh] was reaching for a weapon," and (3) Jalloh "refus[ed] to comply with Hugee's commands after Hugee had asked him, four times, to exit the vehicle." ECF 34-1 at 11–12. As the Court has already explained, the jury could view the facts such that the BOLOs, insofar as they existed, did not even give rise to reasonable suspicion, let alone probable cause. As for the second, Jalloh disputes that he reached for anything, explaining

that he in fact "move[d] very slowly and deliberately to exit the vehicle." ECF 35-5 at 5. Whether Jalloh reached for anything is far from clear in the footage from Hugee's body worn camera because his hands are not visible in the frame, *see* ECF 34-4, Hugee BWC, at 2:14–20, and Jalloh's testimony to the contrary is certainly not "blatantly contradicted" by the video such "that no reasonable jury could believe" him, *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court therefore must at this stage credit Jalloh's testimony and proceed as if he did not reach for anything.

That leaves in support of Hugee's claimed probable cause only the fact that Jalloh did not immediately exit the vehicle when Hugee asked him to do so. But "an individual may decline an officer's request without fearing prosecution," and "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *see also United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) ("A failure to follow orders does not *alone*, however, give rise to reasonable suspicion."). Viewing the facts in the light most favorable to Jalloh, as the Court must, Jalloh took around six seconds to start exiting the vehicle after Hugee ordered him to do so, and once he did start moving, he did so "slowly and deliberately." ECF 35-5 at 5; ECF 34-4, Hugee BWC, at 2:14–20. That is a world away from the facts in the case on which Hugee relies, where the suspect "pushed the officer and went for his own waistband." *United States v. Jones*, 584 F.3d 1083, 1088 (D.C. Cir. 2009); *see* ECF 34-1 at 12. While that conduct no doubt provides "probable cause to arrest . . . for assaulting a police officer," *Jones*, 584 F.3d at 1088, Jalloh's very brief delay in getting out of the car does not give rise to probable cause to believe he committed any crime.

In passing, Hugee also suggests that Jalloh committed a misdemeanor under D.C. law by failing to immediately "comply with Hugee's commands," which gave him probable cause to arrest Jalloh for that offense. ECF 34-1 at 11. The *only* D.C. law Hugee cites in support of that

argument is D.C. Code § 5-117.04. That provision makes unlawful "willful interference . . . with any member of the police force[] by any of the persons named in § 5-117.01." The cross-referenced section that lists people to whom the law applies has been repealed, but when it was in effect it limited the application of this provision to "pawnbrokers," "licensed venders," "licensed hackmen and cartmen," "dealers in secondhand merchandise," and other merchants of the like. D.C. St. 1981 § 4-147. That makes sense—the criminal offense on which Hugee relies is codified in a subchapter of the D.C. Code that addresses the police department's "supervisory power *over certain businesses*." D.C. Code § 5-117.04 *et seq.* (emphasis added). Jalloh is not one of the "persons named in" the repealed statute that listed vendors and merchants, and there is no reason to think the repeal of that cross-referenced section wildly extended this law's coverage. But even if Hugee had gone hunting for another part of the D.C. Code to hang his hat on, he almost certainly would have done so in vain: "[M]erely resisting or disobeying an officer's instructions before any attempt at an arrest is no longer a crime in D.C." *Hylton v. District of Columbia*, No. 21-cv-2673, 2025 WL 740454, at *6 n.12 (D.D.C. Mar. 7, 2025).

Because a jury could find the facts are such that there was not probable cause to arrest Jalloh, Jalloh could likewise prevail on his claim that Hugee's search of his pockets was unconstitutional. If the arrest was unlawful, so too was the search. *See Bookhardt*, 277 F.3d at 564. And that warrantless search would have violated Jalloh's clearly established rights. The D.C. Circuit has long held that, "without a valid arrest, [a] warrantless search cannot be justified by the search incident to arrest exception." *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999). And without "probable cause for arrest," there is no "valid arrest." *Id.*; *see also Bookhardt*, 277 F.3d at 564 (same); *United States v. Valentine*, 539 F.3d 88, 96 (2d Cir. 2008) ("[O]fficers lacking probable cause to arrest a suspect necessarily lack probable cause to conduct a search

incident to that arrest."). Nor can Hugee take refuge in the argument that he "reasonably but mistakenly conclude[d] that probable cause [was] present." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see* ECF 34-1 at 11. The jury could view the facts such that the *only* thing that gave rise to *any* suspicion was Jalloh's brief delay in exiting the vehicle. No reasonable officer would believe that alone could give rise to probable cause to arrest. *See Bostick*, 501 U.S. at 437. Because the jury could conclude that Hugee searched Jalloh's pockets after an arrest made on that complete paucity of suspicion, Hugee is not entitled to qualified immunity on this claim, either.

### 3. A jury could find that Hugee searched Jalloh's car without any reason to believe it contained weapons, which violates a clearly established right.

Jalloh's claim that Hugee unlawfully searched his car is quickly dealt with in light of everything the Court has already said. Hugee justifies that search based on the "automobile exception," which allows for a warrantless search of a vehicle where officers have "probable cause . . . to believe it contains contraband." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). Hugee claims he had probable cause to believe Jalloh's car contained a firearm. *See* ECF 34-1 at 13. But for all the same reasons that a jury could find that Hugee lacked any basis to arrest Jalloh, it could similarly find that there was no reason to believe Jalloh had a weapon or anything else in the car. And if the jury finds Hugee searched Jalloh's car without even an arguable basis of probable cause—as it could—he will have violated Jalloh's clearly established right to be free from a warrantless search of his vehicle. *See California v. Carney*, 471 U.S. 386, 390 (1985).[3]

---

[3] Hugee has not argued that the police dog alerting during its sniff of Jalloh's car provided probable cause for the vehicle search. *See* ECF 34-1 at 13 (no mention of dog). That is likely because Hugee's search of the car began *before* the dog arrived on the scene. *See* ECF 34-4, Hugee BWC, at 2:47–3:30 (Hugee searching car); ECF 34-4, Vaillancourt BWC, at 14:20–24 (officer says they are waiting for dog). The officers seemingly acknowledge as much when they say that, "*during the search*, . . . the police dog[] signaled that he found a firearm." ECF 34-1 at 14 (emphasis added). Regardless, because Hugee has not argued that the dog sniff justified the vehicle search, the Court does not consider that possibility. *See Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 127 (D.D.C. 2023) ("[A]n argument not raised in an opening brief is forfeited.").

In arguing otherwise, Hugee relies on a series of cases that he says hold "officers ha[ve] probable cause to search vehicles under similar circumstances." ECF 34-1 at 13. Those cases all involved facts that are a far cry from what the jury could find happened here: a case where officers "corroborated" that a "car's destination, make, model, color, passengers, and a partial license plate," matched a tip from an informant; a different case where one state police agency warned another that a vehicle was being used for drug trafficking and the vehicle's driver acted suspiciously in several ways after being stopped; and a third where a vehicle was identified by a witness as the getaway car for a bank robbery and a coat inside the car was identified by the same witness as the one worn by one of the robbers. *See United States v. Powell*, 732 F.3d 361, 373 (5th Cir. 2013); *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012); *United States v. Robinson*, 533 F.2d 578, 583 n.10 (D.C. Cir. 1975). If the jury resolves the factual disputes in this case in Hugee's favor, it may well look more like one of those cases and he could prevail. The problem for Hugee, however, is that the jury could also resolve these factual disputes against him and find that this case bears no resemblance at all to those ones. Because the Court must assume at this stage that it will do the latter, the Court denies Hugee's motion for summary judgment on Jalloh's section 1983 claims.

### B. Officer Vaillancourt is entitled to summary judgment because his conduct did not violate any clearly established rights.

This case looks very different from Vaillancourt's perspective. As to Vaillancourt, the key facts are not in dispute: (1) He "was driving a separate patrol car behind Hugee and exited his vehicle as Hugee approached" Jalloh's car, (2) "Vaillancourt observed Hugee asking [Jalloh], several times, to get out of his vehicle and saw Hugee draw his weapon," (3) "[a]fter Hugee drew his gun, Vaillancourt pulled Plaintiff out of the car, put him on the ground, and handcuffed him," and (4) "Vaillancourt released [Jalloh] from the handcuffs once officers finished searching the"

car. ECF 34-2 ¶¶ 6, 9–10, 15; ECF 35-3 ¶¶ 6, 9–10, 15. Those undisputed facts entitle Vaillancourt to qualified immunity on each of the two constitutional claims Jalloh asserts against him.

First, Jalloh says Vaillancourt used excessive force in pulling him out of the vehicle. But Jalloh cites no case that clearly establishes an officer uses excessive force when, relying on another officer's decision to stop a suspect and then to point his firearm at that suspect, he detains the suspect using enough force to take him to the ground and put him in handcuffs. *See* ECF 35-1 at 7–8. It is Jalloh's "burden to show that the particular right in question . . . was clearly established," and he has failed to do so here. *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). The Court therefore resolves this claim on the second prong of the qualified immunity analysis without deciding if Jalloh created a genuine dispute about whether Vaillancourt violated his rights. But the Court notes that it is generally reasonable for a "police officer [to] rely on a fellow officer's assessment of [the] circumstances." *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010). Having seen Hugee make the stop and then draw his service weapon, Vaillancourt's conduct in taking Jalloh down to the ground in an effort to "avoid" any "type of struggle" strikes the Court as reasonable. ECF 35-7 at 9:19–10:2.

In reaching this conclusion, the Court notes that none of the factual disputes at the center of Jalloh's claims against Hugee apply to Vaillancourt. Vaillancourt does not claim to have relied on the BOLO for the blue Nissan. *See id.* at 5:9–11. Nor does Vaillancourt suggest he acted based on Jalloh's supposed resemblance to the second BOLO, or that he saw Jalloh reach for anything in the car. Instead, Vaillancourt acknowledges that he grabbed Jalloh and took him down to the ground "solely based on [his] observations of . . . Hugee." *Id.* at 8:10–14. And Jalloh has not identified anything in the record that suggests it was "objectively [un]reasonable" for Vaillancourt to rely on Hugee's "assessment of [the] circumstances." *Barnhardt*, 723 F. Supp. 2d at 216.

Jalloh's second claim against Vaillancourt—that Vaillancourt "holding" him "in handcuffs for thirty-seven minutes was objectively unreasonable," ECF 35-1 at 13—fails for the same reasons. Vaillancourt, relying on Hugee's actions, believed that Jalloh was lawfully under arrest and, again based on Hugee's actions, also would have believed that the officers were lawfully searching Jalloh's vehicle for weapons. Jalloh has not cited a single authority suggesting that an officer violates someone's constitutional rights by holding them in custody in those circumstances.

### C.  Jalloh's false arrest claims can proceed against Hugee but not against Vaillancourt.

"The gist of any complaint for false arrest" under District of Columbia law "is an unlawful detention." *Weishapl v. Sowers*, 771 A.2d 1014, 1020 (D.C. 2001). "When the plaintiff in a false arrest case shows that he was arrested without a warrant"—as Jalloh was here—"a rebuttable presumption arises that the arrest was unlawful, and the burden shifts" to the defendant "to justify the arrest by showing that it was based on probable cause." *Karriem v. District of Columbia*, 717 A.2d 317, 320 (D.C. 1998); *see also Turpin v. Ray*, 613 F. Supp. 3d 186, 206 (D.D.C. 2020) (collecting cases). "Probable cause is usually determined by reference to the objective standard used to determine probable cause in a criminal proceeding." *Karriem*, 717 A.2d at 320. "[I]f a police officer has so-called constitutional probable cause to arrest," the false arrest claim fails. *District of Columbia v. Murphy*, 635 A.2d 929, 931 (D.C. 1993).[4]

Applying those standards, Jalloh's false arrest claim against Hugee can proceed, while the claim against Vaillancourt cannot. As explained at length above, there is a genuine dispute of fact about whether Hugee had probable cause to arrest Jalloh. As for Vaillancourt, however, the

---

[4] Officers can also "rely on a lesser, partially subjective" defense to a false arrest claim by "showing (1) that the police officer had a good faith belief that his or her conduct was lawful and (2) that this belief was reasonable." *Karriem*, 717 A.2d at 320 n.8. That defense, however, "must be affirmatively relied upon by" the defendants; "if it is not, the objective test applies." *Id.* Officers Hugee and Vaillancourt do not invoke this subjective test, instead arguing only that they did in fact have "probable cause" to arrest Jalloh, so the Court only considers that defense. ECF 34-1 at 17.

relevant facts are not in dispute. When Vaillancourt arrived on the scene, Hugee was opening Jalloh's front door and initiating the *Terry* stop. *See* ECF 34-4, Vaillancourt BWC, at 2:04 (car comes into view as Hugee puts hand in the door handle). Seconds later, Vaillancourt saw Hugee point his service weapon at Jalloh. *Id.* at 2:14. "A reasonable officer arriving to that scene under the circumstances would assume that [Hugee] was arresting" Jalloh. *Ulysse v. Stokes*, No. 19-cv-01465, 2021 WL 4476768, at *4 (D.D.C. Sept. 30, 2021). And an officer in that position is "not obligated to make an independent determination of probable cause." *Barnhardt*, 723 F. Supp. 2d at 216. Because Vaillancourt had probable cause to arrest Jalloh, he is entitled to summary judgment.[5]

Hugee does make one other argument, claiming that Jalloh's false arrest claim against him fails as a matter of law because it is, in substance, an official capacity claim. *See* ECF 34-1 at 16–17. Hugee's argument here boils down to something of a gotcha—first, that Jalloh pled that Hugee was "act[ing] under [his] authority as [an] officer[] of the District of Columbia" and "under the color of law," and second, that a personal capacity suit can only proceed if Jalloh "demonstrate[s]" that Hugee's "actions transcended [his] authority and official duties." ECF 34-1 at 16–17. Because of that claimed pleading mismatch, Hugee says, this is an official capacity claim. And—here comes the kicker—because Jalloh dismissed his official capacity claims, the false arrest claim must ipso facto fail. *See id.* (citing Minute Order August 23, 2022).

That argument misses the mark. Section 1983 authorizes suits challenging actions taken under the color of state law, so Jalloh's "under the color of law" allegation is a normal one to find in a complaint alleging a violation of a federal constitutional right. *See Hafer v. Melo*, 502 U.S.

---

[5] The Court had no need to decide whether Vaillancourt used excessive force in effectuating Jalloh's arrest or unlawfully prolonged Jalloh's detention because it was sufficient to hold that Vaillancourt did not violate clearly established rights. Whether Vaillancourt had probable cause to arrest Jalloh—he did—is a distinct question.

21, 25 (1991) ("[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."); 42 U.S.C. § 1983. Yet plaintiffs regularly bring section 1983 claims and personal capacity false arrest claims in the same case. *See, e.g.*, *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 237, 258 (D.D.C. 2018) (false arrest claims and personal capacity 1983 claims survive summary judgment); *Magliore v. Brooks*, 844 F. Supp. 2d 38, 43–44 (D.D.C. 2012) (false arrest and constitutional claims brought against officers "acting within the scope of their employment" survive summary judgment); *Turpin*, 613 F. Supp. 3d at 193 (false arrest and constitutional claims); *Weishapl*, 771 A.2d at 1016–17 (same). Despite the regularity with which these two claims are pled together, this Court is not aware of—and Hugee has not cited—any decision holding that the presence of the color of state law allegation necessarily defeats a personal capacity suit for false arrest under D.C. law.

Nor is there anything to Hugee's suggestion that the dismissal of the official capacity claims has anything to do with the false arrest claims. The complaint alleges claims against Hugee in both his "individual[]" and "official capacity," ECF 1 at 1, so Jalloh has certainly done enough to plead a "personal liability" claim, *Daskalea v. District of Columbia*, 227 F.3d 433, 448 (D.C. Cir. 2000). And nothing in the complaint suggests the false arrest claim only runs against Hugee in his official capacity. To the contrary, Jalloh specifically alleged in the section of his complaint addressing false arrest that Hugee "violat[ed] . . . all relevant regulations," ECF 1 ¶ 72 which is consistent with a personal capacity claim but not an official capacity one, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). Because none of Hugee's objections to Jalloh's false arrest claim have merit, and because there is a genuine dispute at the heart of that claim, it must proceed past summary judgment.

\*   \*   \*

Defendants' motion for summary judgment, ECF 34, is **GRANTED** in part and **DENIED** in part. The claims against Defendant Hugee can proceed, but Defendant Vaillancourt is entitled to summary judgment in full.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 24, 2025